UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

G TREASURY SS, LLC,

                    Plaintiff,

          -against-

PETER SEWARD,

                    Defendant.

---

Case No.: _____

**COMPLAINT**

Plaintiff G Treasury SS, LLC ("GTreasury"), by and through its undersigned attorneys, as for its Complaint against Defendant Peter Seward ("Seward"), hereby alleges as follows:

## NATURE OF THE ACTION

1.      GTreasury brings this action to enforce Defendant Peter Seward's contractual obligations, to protect its confidential information, client relationships, and goodwill, and to prevent irreparable injury to its business interests by Seward and his new employer.

2.      Seward signed an Employment and Confidentiality Agreement ("Employment Agreement") as a condition of his employment with his employment by GTreasury.

3.      By executing the Employment Agreement, Seward agreed, among other things, that he would not disclose GTreasury's confidential information.  Seward also agreed that, for a period of one year following his separation from employment from GTreasury, he would not act on behalf of any of GTreasury's competitors in any capacity whatsoever.

4.      By virtue of his senior position as Vice President of Market Development, Risk, Seward was directly involved in the development and marketing of GTreasury's products

to prospective clients, and therefore acquired confidential and proprietary information critical to GTreasury's business success.  Seward also had access to GTreasury's trade secrets.

5.      On November 27, 2019, Seward provided notice of his intent to terminate his employment with GTreasury.

6.      Following Seward's resignation, GTreasury attempted to contact Seward to persuade Seward to honor his non-compete obligations.

7.      Seward refused to identify his new employer in response to GTreasury's inquiry.  Notwithstanding, GTreasury has come to learn that Seward is joining its main competitor, Kyriba Corporation ("Kyriba").  To date, Seward has failed to return his work-issued laptop, which contains information relating to GTreasury's product designs and plans and other Confidential Information.

8.      Upon information and belief, Seward is scheduled to start working at Kyriba on or about January 6, 2020.

9.      Seward breached the non-competition provision of his Employment Agreement by competing directly with GTreasury when he joined GTreasury's main competitor.

10.     Given Seward's deep knowledge of the technical aspects of, and direct involvement in the development and marketing of, GTreasury's products, as well as his knowledge of GTreasury's planned product innovations, trade secrets, and business plans, Seward has used or will use GTreasury's confidential information to service and improve Kyriba's similar competing products.

11.     Seward's disregard for his contractual obligations and fiduciary duties, as well as his attempt to conceal such conduct, has caused and will continue to cause irreparable harm to GTreasury such that immediate injunctive relief is warranted and necessary.

**PARTIES**

12.     Plaintiff G Treasury SS, LLC is a limited liability company duly organized and existing under the laws of the State of Delaware with a principal place of business located at 2100 East Lake Cook Road, Suite 1100, Buffalo Grove, Illinois 60089.

13.     Defendant Peter Seward is a natural person whose last known address is 153 Joralemon Street, Apt. 3R, Brooklyn, New York 11201.

**JURISDICTION AND VENUE**

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because this is an action between citizens of different states and the amount in controversy exceeds $75,000 exclusive of interests and costs.

15.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 because Defendant Seward is subject to the Court's personal jurisdiction. Defendant Seward is a resident of the State of New York and conducted business on behalf of GTreasury within, among other places, the Southern District of New York.

**FACTUAL ALLEGATIONS**

16.     GTreasury has been recognized by the corporate treasury industry as the leading innovator and provider of Software-as-a-Service ("SaaS") treasury and risk management solutions for clients looking to manage their digital treasury systems.

17.     Treasury Management Systems ("TMS") are automated systems that allow corporate treasury departments to communicate and/or interface with banking partners.   TMS allows corporate clients to store or access data real time – *e.g.*, relating to cash management, reporting, payments, banking, and accounting – and report and analyze all information in one central location.  TMS allow clients to save time and money by automating otherwise laborious, manual processes.

18.     GTreasury's software provides a full suite of treasury management modules and serves as a connectivity hub for its corporate clients. GTreasury's product enables clients, through a unified platform integrating multiple functionalities, to manage deal and cash lifecycles via end-to-end workflows from cash to accounting to risk and exposure management.

**Seward's Employment with GTreasury**

19.     Historically, GTreasury had focused only on cash management and payments products. GTreasury's products lacked certain functionality, such as financial instrument capabilities, hedge accounting, and risk management, which disadvantaged GTreasury and prevented the Company from selling to a large part of the market.

20.     In April 2018, GTreasury spent $35 million to acquire Australia-based Visual Risk, a software provider and consulting company that specialized in risk management software and previously won Treasury Management International's best Risk Management Solution.

21.     GTreasury's acquisition of Visual Risk provided it with the missing functionality that GTreasury needed to service a larger segment of the market and, as a result of the new functionality, surpassed competitors, such as Kyriba, as it relates to hedge accounting and risk analysis.

22.     No other company possesses the sophisticated end-to-end lifecycle TMS programs that GTreasury has developed.

23.     GTreasury's risk management software allows corporate clients to analyze, interpret, and visualize data with a risk analysis tool, which quantifies market risk sensitivities and enables dynamic risk modeling and stress tests.

24.     With GTreasury's products, clients, for example, can perform risk analyses using user-defined models and scenarios for interest rates, foreign exchange, and

commodities.   Clients can generate cash flow forecasts and perform analyses on actual and proposed portfolios using multiple market data, hedging, and trade target-based scenarios.   Users can also generate simulations and compare against scenario results.   And GTreasury's product allows clients to visualize these results numerically and graphically.

25.     Through GTreasury's acquisition and integration of risk management solutions, GTreasury distinguished its suite of products and obtained a competitive advantage against other providers of treasury management solutions, including Kyriba.

26.     For example, the integration of cash and liquidity management on a unified GTreasury platform means that corporate clients can easily identify, track, and visualize changing exposures.   Because all cash decisions have a risk dimension, the integration of cash and liquidity management allows user to value risk accurately and improve business strategy.

27.     In June 2018, GTreasury further enhanced its risk management expertise by hiring Defendant Peter Seward as GTreasury's Vice President of Market Development, Risk.

28.     At the time of his hire, Seward was (and still is) an industry-recognized risk and hedge accounting expert with significant experience in bringing innovative SaaS solutions to corporate treasury's most complex problems.   To that end, GTreasury devoted resources to bolstering Seward's visibility and reputation in the corporate treasury industry during his employment at GTreasury.

29.     At his previous employer, Seward had worked on integrating products.   As such, when Seward joined GTreasury, Seward worked closely with GTreasury's product team to review the integration of Visual Risk's risk management and hedge accounting functionalities into GTreasury's suite of products.   Seward collaborated with the product team to review the designs to integrate Visual Risk's products, as well as to create new designs that he proposed.

30.     In his role as Vice President of Market Development, Risk, Seward was also tasked to work with prospective corporate treasury clients to help them understand how to use TSM technology to better manage risk and its impact on cash.  Seward translated the needs of the market across GTreasury's innovation teams to provide clients with products tailored to their business needs.

31.     Seward used his knowledge and expertise to provide GTreasury's product team with design advice reflecting industry trends, common practices that he had seen in his experience, and client requests and feedback.  GTreasury's product team would incorporate Seward's recommendations and/or instructions into the design of GTreasury's products.  Seward and GTreasury's product team would go through several iterations of review of a new functionality or product enhancement before its deployment to market.

32.     Seward was exposed to all of GTreasury's highly confidential and proprietary information.

33.     Seward was a critical member of GTreasury who understood the company's advantages and helped design the integration of GTreasury's treasury and risk management solutions.

34.     At GTreasury, Seward was assigned to GTreasury's United States presales engineering team where he played a critical role in the development and sale of products tailored to prospective clients' needs.

35.     For example, Seward is a subject matter expert in the sales process.  When clients and prospective clients present GTreasury with information specific to the client, GTreasury's presales team presents demonstrations of the company's products tailored for the client's business needs.

36.     As part of the presales process, GTreasury heavily relied on Seward to educate clients about the Company's products, particularly relying on Seward's credibility and subject matter expertise in risk management solutions, which has been the key differentiator separating GTreasury from other competitors.

37.     Additionally, Seward regularly tested GTreasury's products under various use scenarios and, in the process, acquired sensitive and detailed information about Treasury's products, including their capabilities, strengths, and limitations.   In doing so, Seward collaborated with the Company's products team in the design and/or modification of GTreasury's products, so that Seward could perform various complex examples of the product.

38.     Due to Seward's critical role at GTreasury, Seward regularly worked with GTreasury's products team and was involved in strategic planning and product development with the Company's Chief Product Officer.   As such, at the time of his resignation, Seward had information about all of GTreasury's strategic plans, as well as the company's products and products roadmap for at least the next twelve to eighteen months.

39.     Seward also had access to information about GTreasury's pricing methods and revenues generated with respect to specific customers and products.

40.     Seward also had access to highly restricted and password-protected information about GTreasury's clients and prospective clients, including, but not limited to, the clients' identities and the identities of buyers looking to purchase TSM and the specific products that the clients sought and/or purchased.

41.     To perform his duties at GTreasury, in addition to the information described above, Seward also had access to other GTreasury non-public information, such as valuation formulas. GTreasury devoted substantial time and resources to develop its Confidential Information and considers it a valuable asset.

42.     Given Seward's involvement in product development and interactions with clients on behalf of GTreasury, as well as his knowledge of the Company's research and strategic plans, Seward knows how and why GTreasury succeeds and what GTreasury needs to win clients against competitors, such as Kyriba.  Competitors, which either do not have or have only a scaled down functionality of GTreasury's products, can leverage this knowledge to create or improve their own products, tailor them to clients and/or prospective clients about whom Seward obtained confidential information at GTreasury, and use this information to compete against and harm GTreasury's business.

43.     By way of example, Kyriba's risk management solutions service very basic corporate needs and do not handle advanced or complex scenarios like GTreasury's solutions.  This is a key differentiator and GTreasury's market research shows that they win against competitors, such as Kyriba, because of its superior risk management products.

44.     Given Seward's involvement in developing and testing GTreasury's risk management products, he has the ability to build up the functionality of Kyriba's products to decrease Kyriba's product disadvantage.

<u>Seward's Employment Agreement</u>

45.     To protect its confidential information and business relationships, GTreasury has adopted written policies restricting the disclosure and use of GTreasury's confidential information other than for official company purposes.

46.     To that end, GTreasury requires certain employees to execute employment and confidentiality agreements as a condition of employment.

47.     In consideration of his employment by GTreasury, Seward entered into an Employment and Confidentiality Agreement ("Agreement") with GTreasury.

48.     On June 14, 2018, Seward executed the Agreement whereby he "agree[d] not to disclose any Confidential Information to others either during or after [his] employment by GTreasury, or to make use of it outside of [his] employment …, except as expressly permitted in writing by GTreasury."

49.     "Confidential Information", as defined in the Agreement, includes, but is not limited to:

    a.     matters not generally known outside GTreasury, such as various development, inventions, software systems and packages, trade secrets, improvements, methods, etc., relating to the products and services marketed or used by GTreasury,

    b.     general business operations of GTreasury (e.g. relating to sales, costs, profits, organization, customer lists, pricing methods, etc.), and

    c.     apparatus, methods, ways of business, etc., which in themselves are generally known, but whose use by GTreasury is not generally known outside of GTreasury.

50.     In signing the Agreement, Seward acknowledged that "irreparable harm shall be occasioned by disclosure of Confidential Information and that GTreasury may seek an injunction to enjoin such disclosure or threatened disclosure without showing actual damages and may seek such other remedies as shall be available to it at law and equity."

51.     Seward also agreed not to compete with GTreasury or solicit its customers, other business relationships, and its employees for a period of one year after the termination of his employment.   Specifically, Seward agreed that he "shall not participate directly or indirectly, nor aid or abet others" in the following:

    a.     inducing or attempting to induce any of GTreasury's customers, suppliers or warehousemen not to do business with GTreasury; or

b.    inducing or attempting to induce any of GTreasury's employees to terminate their relationships with GTreasury; or

c.    disturbing any of GTreasury's relationships with suppliers or the goodwill of GTreasury in any manner whatsoever; or

d.    acting on behalf of any other person, corporation or firm which is engaged in any business or activity similar to or competitive with that of GTreasury in any capacity whatsoever.

<u>Seward's Resignation and GTreasury's Attempts to Abate Seward's Breach</u>

52.    Recognizing Seward's value to GTreasury, GTreasury further invested in Seward's integration within the company by promoting him to several leadership positions.

53.    On November 27, 2019, however, Seward gave GTreasury written notice of his resignation from the Company.

54.    Given Seward's intimate knowledge of GTreasury's products and the Company's business and strategic plans, Seward has the ability to use this information (whether intentionally or inadvertently) to design products for competitors to counteract GTreasury's success in the market.  As such, on or about December 2, 2019, Kirk Dauksavage, GTreasury's Chief Revenue Officer, told Seward that he was bound by the non-compete provisions of his Employment & Confidentiality Agreement and that GTreasury would enforce its rights under that agreement.

55.    In response, Seward stated that he was not aware of any such obligations.

56.    On December 2, 2019, GTreasury emailed Seward a copy of the Employment & Confidentiality Agreement that he had signed when he joined GTreasury.

57.    After the December 2, 2019 discussion with Seward, GTreasury attempted to contact Seward to further discuss his non-compete, non-solicitation, and non-disclosure restrictive covenants given Seward's assertion that he was not bound by any such obligations.

58.     On December 5, 2019, GTreasury's Chief Executive Officer, Renaat Ver Eecke, sent Seward a letter, via email, quoting the Employment & Confidentiality Agreement that Seward signed to remind him of his obligations to refrain from, among other things, competing or aiding and abetting others in competing against GTreasury, inducing other GTreasury employees from terminating their relationship with GTreasury, and disclosing or using GTreasury's Confidential Information.

59.     In its December 5, 2019 letter to Seward, GTreasury informed Seward that it would be fully prepared to defend and enforce its rights under the Employment & Confidentiality Agreement should he breach his ongoing obligations.

60.     Seward did not respond to GTreasury's December 5, 2019 letter.  Nor did Seward provide GTreasury with information, *e.g.*, the identity of his new employer (as previously asked), to confirm whether he would to comply with his obligations under the Employment & Confidentiality Agreement.

61.     Additionally, during Seward's exit interview on December 6, 2019, GTreasury reminded Seward of his non-disclosure, non-compete, non-solicitation, and non-disparagement obligations under the Employment & Confidentiality Agreement.  GTreasury also instructed Seward to return his work-issued laptop and other GTreasury property.

62.     After Seward's exit interview, GTreasury later that day reiterated GTreasury's policy directing Seward to return all GTreasury property, including, but not limited to, customer lists, software, documents, and equipment such as his work-issued laptop.  Further, at Seward's request, GTreasury against emailed Seward a copy of his Employment & Confidentiality Agreement.

63.     Seward's last day of employment with GTreasury was Friday, December 6, 2019.

64.     Several weeks after Seward's written notice of resignation, another GTreasury employee, Andrew Blair, provided notice of his intent to resign from GTreasury.

65.     Blair was on GTreasury's United States-based presales engineering team with Seward, which consisted of three to four members.

66.     On or about December 20, 2019, Blair informed his direct supervisor that he is joining Kyriba, GTreasury's main competitor.  Upon information and belief, Blair's scheduled first day of employment at Kyriba is on or about January 6, 2020.

67.     On December 20, 2019, Blair informed his direct supervisor at GTreasury that Defendant Seward is also joining GTreasury's main competitor, Kyriba.

68.     Upon information and belief, Kyriba has employed Seward with the same or similar responsibilities that he had at GTreasury.

69.     To date, notwithstanding GTreasury's requests, although Defendant Seward selectively returned his work-issued cellphone, he has refused and/or failed to return all his work-issued equipment to GTreasury, including the laptop Seward used to perform tests of GTreasury's products and which contains GTreasury's confidential and proprietary information.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract – Non-Compete)

70.     GTreasury repeats and realleges each and every allegation contained in Paragraphs 1 through 69 of the Complaint as if fully set forth herein.

71.     The Employment & Confidentiality Agreement signed by Defendant Peter Seward is valid and enforceable.

72.     Under the Employment & Confidentiality Agreement, for a period of one year after the termination of his employment with GTreasury, Defendant Seward is prohibited

12

acting on behalf of any other person, corporation or firm which is engaged in any business or activity similar to or competitive with that of GTreasury in any capacity whatsoever.

73.     Kyriba Corp. is a direct competitor of GTreasury and similarly provides treasury and risk management solutions to corporate clients.

74.     Defendant Seward violated the Employment & Confidentiality Agreement by joining Kyriba.

75.     GTreasury fully performed its obligations under the Employment & Confidentiality Agreement.

76.     As a direct and proximate result of Defendant Seward's breach of the Employment & Confidentiality Agreement, GTreasury has suffered and will continue to suffer extensive irreparable injury, loss of good will, harm to its business, and other injury for which there is no adequate remedy at law.

77.     GTreasury will continue to suffer this harm unless and until Defendant Seward is restrained from his conduct and compelled to abide by the terms of the Employment & Confidentiality Agreement.

78.     As a direct and proximate result of Defendant Seward's breach of the Employment & Confidentiality Agreement, GTreasury has suffered and will continue to suffer additional damages, which will continue to accrue in the form of attorneys' fees and costs related to this litigation and lost business in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract – Non-Solicitation of Employees)

79.     GTreasury repeats and realleges each and every allegation contained in Paragraphs 1 through 78 of the Complaint as if fully set forth herein.

80.     The Employment & Confidentiality Agreement signed by Defendant Peter Seward is valid and enforceable.

81.     Under the Employment & Confidentiality Agreement, for a period of one year after the termination of his employment with GTreasury, Defendant Seward is prohibited from participating directly or indirectly, or aiding or abetting others, in inducing or attempting to induce any of GTreasury's employees to terminate their relationship with GTreasury.

82.     Upon information and belief, Defendant Seward has solicited, or threatens to solicit, or has aided and abetted the solicitation of, GTreasury employees, including Andrew Blair, who was on Defendant Seward's team and also resigned from GTreasury to join Kyriba.

83.     GTreasury fully performed its obligations under the Employment & Confidentiality Agreement.

84.     As a direct and proximate result of Defendant Seward's breach of the Employment & Confidentiality Agreement, GTreasury has suffered and will continue to suffer extensive irreparable injury, loss of good will, harm to its business, and other injury for which there is no adequate remedy at law.

85.     GTreasury will continue to suffer this harm unless and until Defendant Seward is restrained from his conduct and compelled to abide by the terms of the Employment & Confidentiality Agreement.

86.     As a direct and proximate result of Defendant Seward's breach of the Employment & Confidentiality Agreement, GTreasury has suffered and will continue to suffer additional damages, which will continue to accrue in the form of attorneys' fees and costs related to this litigation.

## THIRD CLAIM FOR RELIEF
### (Breach of Contract – Non-Solicitation of Clients)

87.     GTreasury repeats and realleges each and every allegation contained in Paragraphs 1 through 86 of the Complaint as if fully set forth herein.

88.     The Employment & Confidentiality Agreement signed by Defendant Peter Seward is valid and enforceable.

89.     Under the Employment & Confidentiality Agreement, for a period of one year after the termination of his employment with GTreasury, Defendant Seward is prohibited from participating directly or indirectly, or aiding or abetting others, in inducing or attempting to induce any of GTreasury's customers not to do business with GTreasury.

90.     Upon information and belief, Defendant Seward has solicited, or threatens to solicit, or has aided and abetted the solicitation of, GTreasury customers, in violation of the Employment & Confidentiality Agreement.

91.     GTreasury fully performed its obligations under the Employment & Confidentiality Agreement.

92.     As a direct and proximate result of Defendant Seward's breach of the Employment & Confidentiality Agreement, GTreasury has suffered and will continue to suffer extensive irreparable injury, loss of good will, harm to its business, and other injury for which there is no adequate remedy at law.

93.     GTreasury will continue to suffer this harm unless and until Defendant Seward is restrained from his conduct and compelled to abide by the terms of the Employment & Confidentiality Agreement.

94.     As a direct and proximate result of Defendant Seward's breach of the Employment & Confidentiality Agreement, GTreasury has suffered and will continue to suffer

additional damages, which will continue to accrue in the form of attorneys' fees and costs related to this litigation and lost business in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF
### (Breach of Contract – Nondisclosure of Confidential Information)

95.    GTreasury repeats and realleges each and every allegation contained in Paragraphs 1 through 94 of the Complaint as if fully set forth herein.

96.    The Employment & Confidentiality Agreement signed by Defendant Peter Seward is valid and enforceable.

97.    Under the Employment & Confidentiality Agreement, Defendant Seward is prohibited from directly or indirectly using or disclosing GTreasury's Confidential Information, as the term is defined in the Agreement, except as required to carry out his duties as an employee of GTreasury or as expressly authorized in writing by GTreasury.

98.    Upon information and belief, Defendant Seward has used or disclosed, or threatens to use or disclose, GTreasury's Confidential Information, in violation of his Employment & Confidentiality Agreement.

99.    GTreasury fully performed its obligations under the Employment & Confidentiality Agreement.

100.   As a direct and proximate result of Defendant Seward's breach of the Employment & Confidentiality Agreement, GTreasury has suffered and will continue to suffer extensive irreparable injury, loss of good will, harm to its business, and other injury for which there is no adequate remedy at law.

101.   GTreasury will continue to suffer this harm unless and until Defendant Seward is restrained from his conduct and compelled to abide by the terms of the Employment & Confidentiality Agreement.

102.    As a direct and proximate result of Defendant Seward's breach of the Employment & Confidentiality Agreement, GTreasury has suffered and will continue to suffer additional damages, which will continue to accrue in the form of attorneys' fees and costs related to this litigation and lost business in an amount to be proven at trial.

### FIFTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duties)

103.    GTreasury repeats and realleges each and every allegation contained in Paragraphs 1 through 102 of the Complaint as if fully set forth herein.

104.    Defendant Seward was employed by GTreasury in a position of trust and confidence.

105.    By virtue of his position at GTreasury, Defendant Seward owed a fiduciary duty and a duty of loyalty to GTreasury, both during and after his employment, and was obligated not to divert GTreasury's business in which it had a tangible expectancy, and not to subvert or misappropriate GTreasury's Confidential Information.

106.    Defendant Seward breached his fiduciary duties owed to GTreasury by directly or indirectly soliciting and/or diverting GTreasury's clients and business opportunities, in which it had a tangible expectancy, to Kyriba, a direct competitor, and/or subverting or misappropriating GTreasury's Confidential Information.

107.    As a direct and proximate result of Defendant Seward's breach of his fiduciary duties, GTreasury has suffered and will continue to suffer extensive irreparable injury, loss of good will, harm to its business, and other injury for which there is no adequate remedy at law.

108.    GTreasury will continue to suffer this harm unless and until Defendant Seward is restrained from taking further action in breach of his fiduciary duties to GTreasury.

109.    As a direct and proximate result of Defendant Seward's breach of his fiduciary duties, GTreasury has suffered and will continue to suffer additional damages, which will continue to accrue in the form of attorneys' fees and costs related to this litigation and lost business in an amount to be proven at trial.

110.    Defendant Seward committed his actions knowingly, willfully, and in conscious disregard of GTreasury's rights.  Accordingly, GTreasury is entitled to recover actual and exemplary damages in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF
### (Tortious Interference with Existing and Prospective Business Relationships)

111.    GTreasury repeats and realleges each and every allegation contained in Paragraphs 1 through 111 of the Complaint as if fully set forth herein.

112.    As a result of his employment with GTreasury, Defendant Seward was intimately familiar with, and had detailed knowledge concerning, the business relationships that existed between GTreasury and its clients.

113.    Upon information and belief, Defendant Seward intentionally, with malice, and without privilege or justification, interfered with GTreasury's business relationships with certain clients using unfair or improper means, and/or with the intent to interfere with such relationships, by soliciting directly or indirectly soliciting and/or diverting certain of GTreasury's clients to Kyriba.

114.    Defendant Seward had actual notice of his post-employment obligations under his Employment & Confidentiality Agreement, which restricted him from soliciting GTreasury's clients and employees for a period of one year following his termination from employment with GTreasury.

115.    GTreasury possesses a protectable interest in its contracts and relations with its clients, in that it has a reasonable expectation of their continued association with GTreasury.

116.    Defendant Seward's conduct was undertaken with malic, or in knowing disregard of or indifference to, the rights and interests of GTreasury.

117.    As a direct and proximate result of Defendant Steward's interference, GTreasury suffered and will continue to suffer extensive irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law.

118.    GTreasury will continue to suffer this harm unless and until Defendant Seward is restrained from his current and intended conduct.

119.    As a direct and proximate result of Defendant Seward's interference, GTreasury suffered and will continue to suffer damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation and lost business in an amount to be proven at trial.

## SEVENTH CLAIM FOR RELIEF
### (Unfair Competition)

120.    GTreasury repeats and realleges each and every allegation contained in Paragraphs 1 through 119 of the Complaint as if fully set forth herein.

121.    Upon information and belief, Defendant Seward engaged in unfair methods of competition in that he has unlawfully seized, appropriated and utilized unfair advantages in his competition with GTreasury from his breach of his obligations under the Employment & Confidentiality Agreement; Defendant Seward's breach of his fiduciary duty and duty of loyalty; and Defendant Seward's interference with GTreasury's business, advantages, and prospective economic relations and contracts, all of which are more fully set forth above.

122.     The aforementioned conduct has resulted in the pirating of GTreasury's Confidential Information.

123.     Upon information and belief, Defendant Seward is acting both individually and on behalf of Kyriba and in connection with such conduct Defendant Seward was, and is, driven by unlawful predatory motives and malice toward GTreasury; or acted in reckless disregard for the rights and interests of GTreasury, in his attempt to obtain an unfair competitive advantage over GTreasury and to damage or injury GTreasury in the industries within which Kyriba competes with GTreasury.

124.     As a direct and proximate result of Defendant Seward's conduct, GTreasury has been damaged in that, by way of illustration and without limitation: (1) the name, reputation and goodwill of GTreasury has been damaged; (2) a direct competitor has secured GTreasury's Confidential Information; (3) GTreasury has lost business, in an amount unable to be ascertained at this time; and (4) the damages suffered by GTreasury is expected to continue and multiply by reason of ongoing breaches by Defendant Seward.

125.     As a direct and proximate result of Defendant Seward's conduct, GTreasury has suffered and will continue to suffer extensive irreparable injury, loss of goodwill, harm to their business, and other injury and damages for which there is no adequate remedy at law.

126.     GTreasury will suffer this harm unless and until Defendant Seward is restrained from his current and intended conduct.

127.     As a direct and proximate result of Defendant Seward's unlawful competition, GTreasury has suffered and will continue to suffer damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation, and lost business in an amount to be proven at trial.

20

## EIGHTH CLAIM FOR RELIEF
### (Misappropriation of Confidential Information)

128.    GTreasury repeats and realleges each and every allegation contained in Paragraphs 1 through 127 of the Complaint as if fully set forth herein.

129.    As a GTreasury senior employee, Defendant Seward learned or had access to GTreasury's Confidential Information.

130.    Upon information and belief, each Defendant Seward has used or disclosed, or threatens to use or disclose, GTreasury's Confidential Information.

131.    Upon information and belief, Defendant Seward is presently misappropriating GTreasury's Confidential Information, and using such information to the detriment of GTreasury.

132.    As a direct and proximate result of Defendant Seward's conduct, GTreasury has suffered and will continue to suffer extensive irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law.

133.    GTreasury will suffer this harm unless and until Defendant Seward is restrained from his current and intended conduct.

134.    As a direct and proximate result of Defendant Seward conduct, GTreasury has suffered and will continue to suffer damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation, and lost business in an amount to be proven at trial.

## NINTH CLAIM FOR RELIEF
### (ILLINOIS TRADE SECRET ACT, 765 ILCS 1065/1, et seq.)

135.    GTreasury repeats and realleges each and every allegation contained in Paragraphs 1 through 134 of the Complaint as if fully set forth herein.

136.    By the conduct alleged herein, Defendant Seward improperly acquired and misappropriated, or threaten to acquire and misappropriate, or inevitably will acquire and misappropriate, GTreasury's trade secret information.

137.    GTreasury's trade secret information is sufficiently secret to derive economic value from not being generally known to others who can obtain economic value from its disclosure or use.

138.    GTreasury has taken reasonable efforts and measures to keep and maintain the secrecy and confidentiality of these trade secrets.  Defendant Seward obtained GTreasury's trade secrets under circumstances giving rise to a duty owed by him to GTreasury to maintain its secrecy and limit its use.

139.    As set forth above, by the conduct alleged herein, Defendant Seward misappropriated or threaten to misappropriate GTreasury's trade secrets by, among other things, using and disclosing, or threatening to use and disclose, and inevitably using and disclosing the trade secrets with GTreasury's consent, and/or acquiring, threatening to acquire, and inevitably acquiring the trade secrets while knowing or having reason to know that he was doing so by improper means.

140.    Defendant Seward breached, inevitably will breach, and/or induced the breach by another former employee, Andrew Blair, of contractual commitments, confidential relationships, and/or duty to maintain the secrecy of said trade secrets.

141.    Upon information and belief, Defendant Seward intended to or inevitably will convert the trade secrets to his economic benefit and/or for the benefit of his new employer, without GTreasury's consent, for anti-competitive use and to convert GTreasury's clients to Defendant Seward and/or his new employer.

142.     As a direct and proximate result of the foregoing, GTreasury has suffered and will continue to suffer immediate irreparable harm, injury, and loss.  Pursuant to the Illinois Trade Secret Act, actual or threatened misappropriation may be enjoined.  Unless enjoined by this Court, Defendant Seward will continue to use GTreasury's trade secret information to unfairly compete and enjoy commercial advantage that he would not otherwise have.

143.     As a direct and proximate result of Defendant Seward's conduct, GTreasury is entitled to damages in an amount to be determined at trial.  Defendant Seward's conduct was willful and malicious, justifying an award of exemplary damages and attorneys' fees.

## TENTH CLAIM FOR RELIEF
### (Conversion)

144.     GTreasury repeats and realleges each and every allegation contained in Paragraphs 1 through 143 of the Complaint as if fully set forth herein.

145.     As a GTreasury employee, Defendant Seward received equipment, including, but not limited to, work-issued laptop and other electronic devices, from GTreasury for use exclusively for the purposes of performing work within the scope of his employment.

146.     At all times, the equipment that Defendant Seward received from GTreasury remained GTreasury's exclusive property.

147.     At all times, the equipment that Defendant Seward received from GTreasury contained GTreasury's confidential and proprietary information.

148.     GTreasury's employment policies require employees to return work-issued equipment following their separation from employment from GTreasury.

149.    GTreasury instructed Defendant Seward several times to return all work-issued equipment, including, but not limited to, his work-issued laptop and other electronic devices.

150.    Defendant Seward's last day of employment with GTreasury was December 6, 2019.

151.    Defendant Seward has refused and/or failed to return all work-issued equipment, including, but not limited to, his work-issued laptop and other electronic devices.

152.    By reason of the foregoing, Defendant Seward refused and/or failed to return all work-issued equipment to GTreasury, as well as the confidential and proprietary information stored therein, with the intent to interfere to the exclusion of GTreasury's rights and GTreasury has the right to possession of such work-issued equipment.

153.    As a direct and proximate result of Defendant Seward conduct, GTreasury has suffered and will continue to suffer damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation.

**WHEREFORE**, GTreasury respectfully requests that judgment be made and entered against Defendant Peter Seward and in favor of GTreasury, as follows:

(a)    Enjoining and restraining Defendant Peter Seward, and any person or entity acting in concert with him or under his supervision, through December 6, 2020, and as extended during any period that the Defendant has breached his obligations to GTreasury, from being employed on his own behalf or on behalf of any other person, corporation, or firm that is engaged in any business or activity similar to or competitive with that of GTreasury, including, but not limited to, Kyriba Corp., or from being engaged in any competing self-employment activities;

24

(b)     Enjoining and restraining Defendant, and any person or entity acting in concert with him or under his supervision, through December 6, 2020, and as extended during any period that the Defendant has breached his obligations to GTreasury, from inducing or attempting to induce any of Plaintiff's customers, suppliers or warehousemen not to do business with Plaintiff;

(c)     Enjoining and restraining Defendant, and any person or entity acting in concert with him or under his supervision, through December 6, 2020, and as extended during any period that the Defendant has breached his obligations to GTreasury, from inducing or attempting to induce any of Plaintiff's employees to terminate their relationship with GTreasury;

(d)     Enjoining and restraining Defendant, and any person or entity acting in concert with him or under his supervision, through December 6, 2020, and as extended during any period that the Defendant has breached his obligations to GTreasury, from disturbing any of Plaintiff's relationships with suppliers or the goodwill of Plaintiff in any manner;

(e)     Enjoining and restraining Defendant, and any person or entity acting in concert with him or under his supervision, from possessing, using, disclosing or disseminating GTreasury's Confidential Information;

(f)     Enjoining Defendant, and any person or entity acting in concert with him or under his supervision, from any other actions in violation of Defendant's contractual obligations or fiduciary duties owed to GTreasury;

(g)     Directing Defendant to return all GTreasury property, including, but not limited, to his work-issued laptop, as well as customer lists, software, documents, keys of any kind (such as key fob, office, file cabinets, building or desk keys), and all equipment (such as iPad, power supplies, laptop batteries, laptop bag and cell phone);

(h)     Awarding compensatory damages and interest to GTreasury in an amount to be determined at trial;

(i)     Awarding exemplary and punitive damages; and

(j)     Granting GTreasury its costs and disbursements incurred in connection with this litigation, including attorneys' fees, together with such other further relief as the Court may deem just and proper.

Dated: January 3, 2020
      New York, New York

                                                        /s/
                                              A. Michael Weber
                                              Gary Moy
                                              LITTLER MENDELSON, P.C.
                                              900 Third Avenue
                                              New York, New York 10022
                                              (212) 583-9600
                                              *Attorneys for Plaintiff*